J-S87018-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF: Z.Y.S., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.S.U., FATHER | No. 1120 MDA 2016 |

Appeal from the Order Entered June 1, 2016
In the Court of Common Pleas of Lackawanna County
Orphans' Court at No(s): A-89 of 2015

BEFORE: LAZARUS, J., SOLANO, J., and PLATT, J.[*]

MEMORANDUM BY SOLANO, J.: **FILED DECEMBER 16, 2016**

M.S.U. ("Father") appeals from the June 1, 2016 order that involuntarily terminated his parental rights to his daughter, Z.Y.S. ("the Child"). Upon careful review, we affirm.

The Child was born in March 2010 and is Father's second child. N.T., 4/18/16, at 17, 29-30. Father's other child, K.U., was born two months earlier, in January 2010. Father retains his parental rights with respect to K.U.

Shortly after the Child's birth, Father was incarcerated in Lackawanna County Prison for possession with intent to deliver, simple assault, and

_____

[*] Retired Senior Judge assigned to the Superior Court.

driving under the influence. In May 2011, he was transferred to SCI Smithfield. N.T., 4/18/16, at 16-17.

In January 2014, the Lackawanna County Office of Youth and Family Services ("OYFS") received a phone call from the Child's mother, K.S. ("Mother"), stating that she might hurt herself or the Child. N.T., 1/12/16, at 12. Mother was taken to Scranton Counseling Center, then to Community Medical Center – Geisinger,[1] and finally to another Geisinger facility in Wilkes-Barre, where she was admitted to the Crisis Unit.

On March 17, 2014, OYFS located Father at SCI Smithfield. N.T., 1/12/16, at 9, 21, 65-66. OYFS sent him a letter on that date, informing him that the agency had opened a case involving the Child. On June 25, 2014, the Child was placed in foster care.

On July 2, 2014, OYFS called SCI Smithfield to inform Father that a dependency hearing was scheduled for the Child on July 7, 2014;[2] the record is unclear as to whether OYFS was able to speak with Father before July 7, 2014. Pet. for Involuntary Termination, dated 12/9/15, at 1; N.T., 1/12/16, at 21. On July 7, 2014, the Child was adjudicated dependent.

On July 18, 2014, OYFS called SCI Smithfield again and asked to speak with Father's counselor. N.T., 1/12/16, at 21. OYFS was told to call

_____

[1] Geisinger is a health system in Northeastern and Central Pennsylvania.

[2] Lackawanna County Juvenile Court Docket Number CP 35 DP 110-2014.

back the following Monday. *Id.* On July 21, 2014, OYFS called SCI Smithfield for the third time and was informed that Father was being paroled that day to Philadelphia Diagnostic and Rehabilitation Center at Gaudenzia ("Gaudenzia"). *Id.*

On August 5, 2014, OYFS called Gaudenzia but was not able to speak with anyone regarding Father. N.T., 1/12/16, at 21. Later that same day, OYFS mailed a copy of a permanency plan via regular and certified mail to Father at Gaudenzia. *Id.* OYFS was eventually able speak with an employee of Gaudenzia, but he was unable to confirm whether Father was in the facility. Finally, on August 5, 2016, Father returned OYFS' call and was informed that a "Family Team Conference" was scheduled for August 7, 2014; Father participated in the conference by telephone. *Id.* at 22.

On August 29, 2014, OYFS again spoke with Father. N.T., 1/12/16, at 22. Father stated that he would be submitting a home plan for approval by September 18, 2014, and that if the plan was approved, Father would be moving back to Lackawanna County. *Id.*[3] The caseworker inquired about

---

[3] The term "home plan" is never defined in the record, but this Court infers that all parties understood this term to mean a plan for Father's living arrangements after his release from incarceration and from any halfway house, possibly where the Child could visit or live with him.

scheduling visits between Father and the Child when he returned. *Id.*[4] OYFS sought to schedule such visits to establish a relationship between Father and the Child. *Id.* at 26-27.

In October 2014, Father was discharged from Gaudenzia because he did not complete certain requirements of Gaudenzia's rehabilitation program. He moved to a halfway house. N.T., 1/12/16, at 22. OYFS was unable to schedule any visits between Father and the Child at that time because Father had not yet completed a treatment program. *Id.* at 23.

A visit between Father and the Child eventually occurred on December 1, 2014. N.T., 1/12/16, at 24. Prior to this visit, Father had only met the Child once when the Child was a newborn in the hospital. *Id.* at 77; N.T., 4/18/16, at 17. A second visit occurred on January 26, 2015. N.T., 1/12/16, at 24. Both visits reportedly went well, and each visit was between one hour and ninety minutes long. *Id.* at 24, 77. The visits then stopped because Father advised the caseworker that he obtained employment and was working full time during the week. *Id.* OYFS made weekend appointments available to Father, but Father never scheduled any weekend visits. *Id.*

---

[4] There is nothing in the record of the results of these discussions; it is unclear whether any visits were scheduled, although none appear to have occurred. *See* N.T., 1/12/16, at 22.

OYFS then lost contact with Father. On March 25, 2015, OYFS e-mailed Father's former counselor at Gaudenzia to see if the counselor had Father's current phone number, but OYFS did not receive a response. N.T., 1/12/16, at 24. On March 30, 2015, OYFS called the counselor but received no answer. *Id.* at 25. On April 3, 2015, OYFS called Gaudenzia again, but again was unable to connect with the counselor. *Id.* At that point, OYFS sent a letter via regular mail and another e-mail to the counselor. *Id.*[5]

According to later testimony of the Child's OYFS case worker at that time, Danielle Beahan:

> At some point in April [2015,] I was informed by this counsellor that [Father] was moved to a different facility. Allegedly his room was raided. There was paraphernalia found. And he was transferred to another facility.
>
> It wasn't until April 23rd, that I contacted Liberty Management[6] to confirm that he was there, left a message for his new counselor[.]

N.T., 1/12/16, at 25.

On June 3, 2015, OYFS was able to contact Father by phone, and Father explained he was still preparing a home plan. N.T., 1/12/16, at 25. After unsuccessful attempts to reach Father's counselor at the detention facility on June 5 and 17, 2015, an OYFS counselor reached Father's

---

[5] The letter and e-mails are not in the record, and no summary of their contents was provided.

[6] According to the orphans' court opinion, Liberty Management is a halfway house. Orphans' Court Opinion, 9/23/16, at 4.

counselor by phone on June 29, 2015, and was informed that visits between Father and the Child could be scheduled only on weekends.  *Id.*  Ms. Beahan testified that she "wasn't able to bring [the Child] down there for a visit during the week" because Ms. Beahan "couldn't leave the county due to medical reasons.  And there wasn't a visit set up for someone to transport her down there."  *Id.* at 25-26. OYFS had no contact with Father from July through November 2015, but Father called the Child's foster parents once during this time period to inquire about the Child.  *Id.* at 86; N.T., 4/18/16, at 32.

In November 2015, OYFS discovered that Father was incarcerated in the Lackawanna County Prison.  N.T., 1/12/16, at 86.  When OYFS spoke to Father, he stated that he had a home plan – specifically, a plan to rent a single room in a home – and that he would be released soon.  *Id.* at 87; N.T., 4/18/16, at 41; Orphans' Court Opinion, 9/23/16, at 9.  However, a counselor at the prison disputed Father's statement that Father had a home plan, N.T., 1/12/16, at 87, and OYFS later learned that, due to his lack of a home plan, Father had been moved from the Lackawanna County Prison to SCI Wernersville.  *Id.* at 89.  From July 2015 until commencement of the termination of parental rights hearings in January 2016, Father had no contact with the Child and never called OYFS to inquire about the Child, even though he had access to a telephone.  *Id.* at 86; N.T., 4/18/16, at 31.

On December 9, 2015, OYFS filed petitions seeking the involuntary termination of both Father's and Mother's parental rights pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(1)-(2), (5), (8), (b). On January 12, 2016, and April 18, 2016, the orphans' court held termination of parental rights hearings. On the first date, Father was incarcerated at SCI Wernersville and participated by phone. By the second hearing, Father had again moved to a halfway house, and he participated in person. N.T., 4/18/16, at 15.

During the hearings, the Child's first OYFS caseworker, Ms. Beahan, testified that Father was not a placement candidate due to his continued incarceration. N.T., 1/12/16, at 26. Ms. Beahan explained that the only objective in the permanency plan that OYFS developed for Father was to establish a relationship with the Child. *Id.* at 26-27. She added that after OYFS lost contact with him in the spring of 2015, Father did not communicate with the agency. *Id.* at 80.

The Child's then-current OYFS caseworker, Lisa Herie, testified that, as late as November 2015, Father was still telling her that he had a home plan: he was going to be moving to Monroe Avenue in Scranton; he also promised her that he would talk to her again when he was released from Lackawanna County Prison. N.T., 1/12/16, at 87. Ms. Herie further testified that the Child is doing well with her foster parents, who are ready, willing, and able

to adopt the Child. *Id.* at 97. Ms. Herie had no concerns about the Child's placement and considers it a safe and appropriate setting. *Id.*

Following the conclusion of OYFS's case-in-chief, the orphans' court granted Father's demurrer with respect to the portions of OYFS's petition based on 23 Pa.C.S. § 2511(a)(5) and (8), because, at the time of the Child's removal from Mother's home and placement in foster care in early 2014, the Child was not "removed from the care of [Father]," as required by subsections (a)(5) and (a)(8). The uncontroverted evidence established that Father was incarcerated at that time. *See* N.T., 4/18/16, at 10-14; Orphans' Ct. Op. at 10 (citing *In re C.S.*, 761 A.2d 1197, 1200 & 1201 n.5 (Pa. Super. 2000) (termination under subsections 2511(a)(5) and (a)(8) is not appropriate where the record reflects that the child was not in the parent's care – due to the parent's incarceration – at the time that the child was removed from his or her previous situation)).

Father testified on own his behalf. N.T., 4/18/16, at 15-52. He stated that he "would like to have [the Child] by his side." *Id.* at 29. During cross-examination, Father admitted that he had never lived with the Child, changed the Child's diaper, taken care of the Child when she was sick, fed the Child, or sent the Child a card or other correspondence directly or via

OYFS. N.T., 4/18/16, at 44, 48.[7]  Father also acknowledged that, although he produced four home plans, none of them were ever approved.  *Id.* at 44.

By an order signed on June 1, 2016, and filed on June 6, 2016, the orphans' court terminated Father's parental rights to the Child pursuant to Section 2511(a)(2)[8] and (b).  On July 6, 2016, Father filed this timely appeal.  Father presents two issues for our review:

> A.     Whether the TRIAL COURT erred as a matter of law and/or manifestly abused its discretion in determining the AGENCY sustained its burden of proving the termination of FATHER's parental rights is warranted under Sections 2511(a)(1) and/or 2511(a)(2) of the Adoption Act?
>
> B.     Even if this Court concludes the AGENCY established statutory grounds for the termination of FATHER's parental rights, whether the TRIAL COURT nevertheless erred as a matter of law and/or manifestly abused its discretion in determining the AGENCY sustained its additional burden of proving the termination of FATHER's parental rights is in the best interests of the CHILD?

Father's Brief at 5 (emphasis in original).

We consider Father's issue mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported

_____

[7] By the time of the hearing, the Child was six years old.

[8] Although the orphans' court recognized that OYFS had petitioned to terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) as well, the court based its decision only on subsection (a)(2).  Orphans' Ct. Op. at 8.

by the record.  If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion.  A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  The trial court's decision, however, should not be reversed merely because the record would support a different result.  We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2511, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent.  The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a).  Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.  One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).  The burden is on the petitioner seeking termination to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are met.  *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

- 10 -

The orphans' court found that there was sufficient evidence to terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2) and (b) of the Adoption Act. Orphans' Ct. Op. at 8. These provisions state:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds: . . .
>
>> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
>> . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

Father argues that the evidence does not support termination under Section 2511(a)(2), because —

> The AGENCY failed to establish the statutory factors necessary to terminate his parental rights pursuant to Section[] 2511(a)(2) of the Adoption Act by clear and convincing evidence. . . .
>
> The TRIAL COURT erred as a matter of law and/or manifestly abused its discretion in determining the AGENCY sustained its burden of proving the termination of FATHER's parental rights is warranted under Section[] 2511(a)(2) of the Adoption Act.

As this Court has explained:

> "Judicial inquiry is to be centered on the best interest of the children, rather than the fault of the parent,

- 11 -

> but **ONLY <u>AFTER</u>** [Father's] incapacity has been proven by clear and convincing evidence."
>
> <u>In re Adoption of C.A.W.</u>, 683 A.2d 911, 917-918 (Pa.Super. 1996)(Emphasis Added)
>
> . . .
>
> To support termination under Section 2511(a)(2) of the Adoption Act, the AGENCY is required to demonstrate the reasons for placement cannot or will not be remedied by the parent. . . . Applying the criteria of this Section of the Adoption Act to the circumstances confronted by FATHER **at the time of placement of the CHILD**, FATHER was incarcerated. [<u>NT</u>, (01/12/2016), pp. 21, 65-66]
>
> Although FATHER's formal home-plan had not been adopted as of April of 2016, his access to CHILD was the only obstacle to maintaining a relationship with CHILD similar to his relationship with his other daughter, K.U., with whom he talks to every day on the phone and visits whenever he gets a travel pass. [<u>NT</u>, (04/18/2016), pp. 29-32]

Father's Brief at 7-8, 13-14 (emphasis in original).

The record shows that OYFS began to provide services to the Child in January 2014, at a time when Father's location was unknown. N.T., 1/12/16, at 12, 21, 65-66. OYFS was unable to locate Father until March 17, 2014, and was not able to communicate with him until August 2014. *Id.* at 21, 65-66. In the meantime, on June 25, 2014, the Child was placed in foster care. *Id.* at 9, 65. Thus, there was a span of eight months during which the agency was involved with the Child and unable to locate and/or to communicate with Father. After he was located, Father had only two supervised visits with the Child, and they lasted only 60 to 90 minutes each. *Id.* at 24, 77. Before that, Father had seen the Child only once, when the Child was a newborn in the hospital. *Id.* at 77; N.T., 4/18/16, at 17. Father

and the Child have therefore spent only a few hours in each other's company during the Child's entire six-year life.

From August 29, 2014 until April 18, 2016, Father repeatedly reported to OYFS that he would soon be released from prison and be able to regain custody of the Child; however, as of the date of the final hearing, Father was still living in a halfway house. N.T., 4/18/16, at 15. Further, Father's proposed home plan was to rent only a single room. *Id.* at 44; Orphans' Ct. Op. at 9. Additionally, Father made no attempts during or after his incarceration to communicate with or to learn about the Child: he never sent her a card or other correspondence, and he never called OYFS to inquire about the Child, even when he had regular access to a telephone. N.T., 1/12/16, at 86; N.T., 4/18/16, at 31, 44, 48. OYFS had no contact with Father from July through November 2015, and Father spoke with Child's foster parents only once to ask about the Child's wellbeing. N.T., 1/12/16, at 86; N.T., 4/18/16, at 32.

Thus, we agree with the orphans' court that the "uncertainty in housing and lack of contact for [the Child's] entire life clearly shows a failure on Father's part to perform essential parental duties." Orphans' Ct. Op. at 9. Hence, we again concur with the orphans' court, *id.*, that OYFS "has satisfied its burden of proof" by providing clear and convincing evidence of the "repeated and continued incapacity" of Father to provide the Child with "essential parental care," *see* 23 Pa.C.S. § 2511(a)(2), therefore satisfying

the statutory grounds for termination. **See L.M.**, 923 A.2d at 511. Thus, the trial court did not commit an error of law or abuse its discretion in holding that the requirements of Section 2511(a)(2) were met.

With respect to Section 2511(b), this Court has explained that, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into [the] needs and welfare of the child." **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted), **appeal denied**, 897 A.2d 1183 (Pa. 2006). The trial court must "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." **Id.** (citation omitted). "The extent of any bond analysis . . . necessarily depends on the circumstances of the particular case." **In re K.Z.S.**, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted). Additionally, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." **In re Z.S.W.**, 946 A.2d 726, 732 (Pa. Super. 2008). The well-being and permanency of a child cannot be tolled indefinitely. **In re C.L.G.**, 956 A.2d 999, 1007 (Pa. Super. 2008).

Father argues that the evidence does not support termination under Section 2511(b). **See** Father's Brief at 7; **see also id.** at 14, 16. Although Father does not contend that a parent-child bond exists between him and the Child, he quotes **In re S.D.T., Jr.**, 934 A.2d 703, 706 (Pa. Super. 2007), **appeal denied**, 950 A.2d 270 (Pa. 2008), **op. after remand**, 964 A.2d 953

(Pa. Super. 2008), for the proposition that "[t]he effect of severing the bond between the parent and child is 'a major aspect of the needs and welfare analysis.'" Father's Brief at 15. Because there is no existing bond between Father and the Child, we find that principle inapplicable here.

Father was incarcerated in March 2010, a few days after the Child was born. Father has had two parental visits with the Child, occurring almost two years ago, and the Child has not seen or heard from Father since that time, let alone been in his exclusive care. Orphans' Ct. Op. at 3-4, 10; N.T., 1/12/16, at 24-26, 77; N.T., 4/18/16, at 17. Father did not initiate any contact with the Child, either by telephone or otherwise, since those visits. N.T., 1/12/16, at 24-26, 77, 80, 86; N.T., 4/18/16, at 31-32. Father does not contest these facts. Father's Brief at 15 (citing N.T., 1/12/16, at 23-24, 69; N.T., 4/18/16, 25-26). The orphans' court thus correctly held that there is no existing bond between Father and the Child. Orphans' Ct. Op. at 10.

The Child has resided in the child's current foster home since June 25, 2014. N.T., 1/12/16, at 9, 65. This placement has afforded the Child permanency for a substantial part of the Child's young life and has fulfilled "the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b).

The orphans' court reasoned that delays and lack of permanency are "clearly harmful" to the Child's emotional well-being and that termination of Father's parental rights will allow the Child "to achieve permanency and end

the uncertainty that has consumed the past two (2) years of [the Child's] life." Orphans' Ct. Op. at 10. Although Father argues that he will eventually be released from incarceration, including from halfway houses, and will ultimately find appropriate housing, **see**, **e.g.**, N.T., 1/12/16, at 22, 87, we cannot toll the Child's well-being and permanency indefinitely while waiting for Father to shoulder the responsibilities of parenting. **See C.L.G.**, 956 A.2d at 1007; **Z.S.W.**, 946 A.2d at 732.

Accordingly, the orphans' court did not abuse its discretion in holding that "it is in the best interest of the [C]hild for the parental rights of Father [to] be terminated." Orphans' Ct. Op. at 10. The record supports the orphans' court's view that the involuntary termination of Father's parental rights will serve the developmental, physical, and emotional needs and welfare of the Child pursuant to Section 2511(b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/16/2016